Earl CARSON and Lydia
Rivers, Plaintiffs,

v.

Detective William LEWIS, Chief Thomas
Blomberg, and Suffolk County,
Defendants.

No. 95–CV–2802(JS).

United States District Court,
E.D. New York.

Feb. 4, 1999.

252

Lawrence Kelly, Sayville, NY, for plaintiffs.

Scott Schneider, Assistant County Attorney, Suffolk County Department of Law, Hauppauge, NY, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Presently pending before the Court is Defendants' joint motion for summary judgment in this civil rights action, alleging violations of 42 U.S.C. §§ 1983, 1981, and 1985, stemming from the arrest of Plaintiff Earl Carson and the search of Plaintiffs' residence. On or about March 6, 1998, this Court So Ordered a Stipulation of Discontinuance as against Defendants James Catterson, Suffolk County District Attorney, and William T. Ferris, III, Suffolk County Assistant District Attorney, and the present caption reflects this change.

On December 10, 1998, this Court heard oral argument on the original motion for partial summary judgment and directed the parties to brief why complete summary judgment should not be granted the Defendants. After consideration of all the briefs and exhibits submitted before and after the hearing, and the arguments advanced at the hearing, for the reasons that follow, Defendants' motion for summary judgment is granted in its entirety and Plaintiffs' complaint is dismissed with prejudice.

## BACKGROUND

The facts as presented in Plaintiffs' complaint are that on or about July 13, 1992, Judith Monroe entered the Patchogue Post Office and passed an employee a note claiming she was abducted. The employee called 911 and passed on the information. The Suffolk County Police Department (hereinafter "SCPD") responded, investigated and arrested the Plaintiff Earl Carson for an outstanding bench warrant and ultimately for kidnaping and burglary. Monroe claimed that Carson abducted her from her home, burglarizing it in the process, and held her captive in Plaintiffs' residence while another male raped and sodomized her. Defendant Detective Lewis obtained and executed two search warrants for the premises rented by Earl Carson and Lydia Rivers, at 905 Sipp Avenue, East Patchogue, New York. A Grand Jury was convened and on July 17, 1992, it returned an indictment for burglary in the second degree against Earl Carson, however, new evidence was presented to a second Grand Jury in or about January 1993, which did not return a true bill and Carson was released from Suffolk County Jail.

Plaintiffs contend that the SCPD should have realized that Monroe, the complaining witness, was a drug user whose allegations were not credible. Further, Plaintiffs allege that the information provided in support of the application for a search warrant was knowingly false, made for the express purpose of garnering overtime, and that the resultant search exceeded the scope of its authority. In addition, Sergeant Pepper of the SCPD filed a report on or about July 14, 1992, which purportedly established that Carson should be released, however, Plaintiffs assert that the Defendants purposefully failed to act on the exculpatory information provided. Finally, the Plaintiffs maintain that the second Grand Jury was only assembled after Newsday ran a scathing article highlighting the lack of objective evidence supporting Carson's arrest.

Plaintiffs' first cause of action is brought under 42 U.S.C. § 1981, alleging that because Plaintiffs are black they were treated differently than white citizens. Plaintiffs' second cause of action is brought pursuant to 42 U.S.C. § 1983, alleging police and prosecutorial misconduct. Plaintiffs' third cause of action is brought under 42 U.S.C. § 1985(3), alleging that Defendants conspired to deprive Plaintiffs of the equal protection of law. Plaintiffs demand a jury trial and each seek approximately 90 million dollars in damages.

Defendants presently move for summary judgment asserting, *inter alia*, that no false arrest claim can exist because Carson was initially arrested for an outstanding bench warrant for failing to appear to answer a charge of driving while intoxicated. Defendants' also assert that an arrest based upon probable cause established through a private citizen's complaint is presumptively valid, and therefore, in light of the information known to the Defendants at the time of the arrest, the false arrest and malicious prosecutions claims must be dismissed as a matter of law. Defendants Detective William Lewis and Chief Thomas Blomberg also move for summary judgment with respect to Carson's false arrest and malicious prosecution claims on the grounds of qualified immunity. In that regard, Defendants assert that the existence of probable cause for the arrest precludes a § 1983 claim, irrespective of the Defendants' motivations, whether pure or otherwise. Finally, Defendants assert that a loss of consortium claim, as alleged by Plaintiff Lydia Rivers, is not actionable under § 1983.

## DISCUSSION

### I. STANDARDS FOR GRANTING SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A Charles Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)).

A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)).

It is within this framework that the Court addresses the present summary judgment motion.

### II. FALSE ARREST

■ Plaintiffs' Section 1983 claims allege violations of the First, Fourth, Fifth, Eighth and Fourteenth Amendments in connection with Carson's arrest and the search of their residence. Claims brought under 42 U.S.C. § 1983 are guided by the tort law of the forum state. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995), *cert. denied*, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

■ As an initial consideration, an arrest pursuant to an outstanding warrant is presumptively valid. *Golino v. City of New*

*Haven,* 950 F.2d 864, 870 (2d Cir.1991). At the Patchogue Post Office, Carson was taken into custody by one of the first assigned officers, Police Officer Soto, for violation of outstanding bench warrants arising from Carson's failure to appear to answer charges of driving while intoxicated and driving without a license, pursuant to New York State Vehicle and Traffic Law Sections 1192.2 and 509.1, respectively. Carson pled guilty on reduced charges, and as such, Carson's initial arrest was therefore lawful and Plaintiffs do not challenge the validity of this arrest. Any and all errors that arose with respect to the warrant procedures were not of a constitutional magnitude.

The next inquiry is whether the charges subsequently brought against Carson, burglary and kidnapping, violated his constitutional rights. To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Singer,* 63 F.3d at 118. It cannot be gainsaid that a claim for false arrest will not stand where the arresting officer had probable cause. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985) ("It is abundantly clear that a finding of probable cause will defeat state tort claims for false arrest, false imprisonment and malicious prosecution."); *Peterson v. County of Nassau,* 995 F.Supp. 305, 313 (E.D.N.Y.1998) (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *Decker v. Campus,* 981 F.Supp. 851, 856 (S.D.N.Y. 1997) ("If there existed probable cause at the time of the arrest, the arrest is privileged, and the individual has no constitutional or statutory claim against the officer who made the arrest.").

Probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d

at 852. Probable cause requires only a "probability or a substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Thus, the existence of probable cause, *vel non,* is assessed based on probabilities, not certitude, as viewed by a reasonably prudent law enforcement official considering all the objective facts known prior to effectuating the arrest. Consequently, the validity of an arrest does not depend upon an ultimate finding of guilt or innocence. *See Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

Probable cause can be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *see also Labensky v. County of Nassau,* 6 F.Supp.2d 161, 177 (E.D.N.Y.1998) (finding probable cause as a matter of law); *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 135 (E.D.N.Y.1998) (granting Rule 50 motion for judgment as a matter of law because officer had probable cause at the time of arrest); *Pawlicki v. City of Ithaca,* 993 F.Supp. 140, 145 (N.D.N.Y.1998) (finding probable cause as a matter of law and granting summary judgment even though arresting officer was faced with competing accounts from different eyewitnesses); *Decker,* 981 F.Supp. at 858 (finding probable cause as a matter of law and granting defendant's motion for summary judgment).

Furthermore, an officer's subjective motivations are never in issue. The Supreme Court has stated that "[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (internal quotations and citations omitted). Specifically, when analyzing issues surrounding the constitutionality of searches and sei-

zures under the Fourth Amendment, the Second Circuit has adopted a wholly objective "authorization" test, which provides that "so long as the police are doing no more than they are legally permitted and objectively authorized to do," their actions are constitutional. *United States v. Scopo*, 19 F.3d 777, 783–84 (2d Cir.), *cert. denied*, 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994) (internal quotations and citations omitted). This is noteworthy because a considerable number of Plaintiffs' accusations surround the motivations of the SCPD officers—whether to garner overtime or to discredit Sergeant Pepper—allegations superfluous to the Court's immediate consideration.

■ With regard to Detective Lewis' evaluation of the facts and circumstances establishing probable cause to arrest Carson on burglary and kidnapping charges, it is necessary to consider the statements provided to the police prior to charging Carson.

Patricia Duffett filed a report with the SCPD on or about July 13, 1992, and she notarized a sworn statement at 4:10 p.m. on that date, indicating that on the previous day she was at home at 552 South Ocean Avenue, Patchogue, in the company of her common-law husband, her two children and her mother, Judith Monroe, when Earl Carson, accompanied by a person unknown to Duffett, loudly banged on her door. Apparently entering through the unlocked door, without permission, Carson proceeded to argue with Monroe, which led to Carson's grabbing Monroe's pocketbook, taking it outside, and rummaging through its contents. Duffett and Monroe attempted to retrieve the pocketbook without success. During the commotion, Duffett's newly purchased dog got out of the house and ran away, with Duffett in pursuit. When Duffett returned to her house, Carson, his companion Emmett Perry, and her mother Judith Monroe were gone, and Monroe's vehicle, a 1980 Ford Thunderbird, was also missing. A neighbor informed Duffett that her mother was forced into the car. Duffett's narrative was, in part, the basis for the burglary and kidnapping charges.

Judith Monroe filed a report with the SCPD on July 13, 1992, providing three separate sworn statements to Detective Lewis. The first at 5:09 p.m., the second at 6:37 p.m. and the third at 8:18 p.m. Monroe's narratives, memorialized in the three statements, are consistent and supply the factual predicates for the crimes charged.

Specifically, the first statement relates to the kidnapping and includes the following relevant events. Judith Monroe knew Earl Carson for about one month prior to the events in question, and she recognized Carson's voice when he was banging on her daughter's door. When Carson and Perry entered, Carson said "[g]ive me your car keys, you're coming to my house." Monroe refused, but Earl grabbed her by her arm and pulled her out of the house toward her car all the while shouting, "[y]ou're going with me or I'll kill you. You'll be buried by morning." Monroe was fearful for her life and safety as she was directed into her car and told by Carson to drive or he would kill her daughter and grandchildren. Once they started out, Carson switched positions with Monroe and drove her car around for a couple of hours before going to Carson's house at 905 Sipp Street in Patchogue. After entering the house, Carson told Monroe that "she knew too much about him and that he would have to kill her." Realizing she could not escape, Monroe went into an empty bedroom to try to sleep for a few hours. The next morning she told Carson she wanted to leave, but he would not let her. Under the guise that she had to go to the Post Office to pick up her social security check of $508.00, Monroe convinced Carson to allow her to go, but Carson insisted on accompanying her. While still in the house, Monroe wrote a note to pass to a postal clerk she knew in the Patchogue Post Office. Upon arrival at the post office, Monroe retrieved her mail from her post office box and then passed her note to Jim, the familiar postal employee. Upon reading the note, which indicated that Monroe was being held and needed help, Jim told her that she would have to accompany him upstairs to sign for the social security check. Carson indicated that he would wait while Jim escorted Monroe upstairs, at which point the police were called.

The second sworn statement provided information used in support of the warrant application to search for illegal weapons and stolen property. Monroe recounted observing approximately 200 movie video tapes in Carson's residence that were allegedly stolen from different video stores. Carson informed Monroe that the two televisions in the residence were stolen from 550 South Ocean Avenue. In addition, Monroe indicated that Carson showed her three guns he stored in his bedroom closet, along with other possibly stolen items.

The third statement recounts the information relevant to the purported rape and supported the search warrant application for evidence of the rape. Monroe stated that she was abducted from her home by Earl Carson and another individual, later determined to be Emmett Perry. Monroe was forced to drive her vehicle to Carson's residence at 905 Sipp Avenue, where Lydia Rivers, Lynette Wilkerson and two unknown males were present. She was told to go into a bedroom and was joined by Perry, Wilkerson and an unknown male. There were two beds in the room and the three others proceeded to get undressed and engage in sexual activity in the other bed. Monroe was told to take off her shirt and to watch them. Afterward, the unknown male left the room and Perry went into the bed occupied by Monroe and proceeded to force her to get undressed, after which Perry penetrated her against her will. During this occurrence, Wilkerson yelled at Perry: "What are you doing with that white trash bitch, get over here." Monroe indicated that when Perry got off of her, he ejaculated on her leg.

Plaintiff was charged with one count of kidnapping in the second degree and one count of burglary in the second degree. Kidnapping in the second degree is defined in Section 135.20 of the New York Penal Law as: "A person is guilty of kidnapping in the second degree when he abducts another person." Abduction means to restrain a person by secreting the person in a place where he or she is not likely to be found, while restrain means to restrict a person's movements in a place where the restriction commences, or by moving the person from one place to another,

and such is accomplished by physical force or intimidation. Penal Law § 135.00[1]. The sworn statements provided by Judith Monroe would lead a reasonable police officer to believe that probable cause existed to charge the Plaintiff, Earl Carson, with kidnapping in the second degree.

Burglary in the second degree, as relevant herein, requires a showing that a person knowingly entered or remained unlawfully in a dwelling with intent to commit a crime therein. The sworn statements provided by Judith Monroe and Patricia Duffett establish the requisite elements of the crime of burglary in the second degree. Entering the residence without permission of the owner or the occupant, Carson and Phillips forced Carson out of the residence and into her vehicle, abducting her in the process. These actions satisfy the elements of the crime of kidnapping, and the crime of burglary as well. Additionally, taking Monroe's pocketbook constituted the crime of attempted larceny, buttressing the burglary charge. As such, a reasonable police officer provided with the sworn statements of Monroe and Duffett could properly conclude that probable cause existed to charge Carson with burglary in the second degree.

█ The predicate for Detective Lewis' conclusion that probable cause existed to arrest Carson for burglary and kidnapping was the sworn statements provided by the victim, Judith Monroe, and her daughter, Patricia Duffett. An officer's arrest based on a victim's positive identification is presumptively valid. For example, in *Singer*, 63 F.3d at 118–19, the Second Circuit affirmed the summary dismissal of the false arrest claim on the ground that there was probable cause for the arrest because the officer was directly advised by the store owner who was present during the crime and knew the criminal's identity, and the owner's veracity was not in doubt. *Id.* at 119; *see also McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir.1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint

was unfounded."); *Miloslavsky v. AES Eng'g Soc'y Inc.*, 808 F.Supp. 351, 355 (S.D.N.Y. 1992) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."), *aff'd*, 993 F.2d 1534 (2d Cir.), *cert. denied*, 510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993); *Thomas v. Culberg*, 741 F.Supp. 77, 80 (S.D.N.Y.1990) ("Officers have probable cause to arrest if they receive 'information from some person—normally the putative victim or eyewitness—who it seems reasonable to believe is telling the truth.' ") (quoting *Daniels v. United States*, 393 F.2d 359, 361 (D.C.Cir.1968)).

■ Because an unequivocal identification of a suspect received by police from a victim or eyewitness can provide probable cause, then, "[a]ssuming the information . . . relied upon was wrong, probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information," *Bernard*, 25 F.3d at 103 (citing *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455–56, 455 N.E.2d 1248 (1983)).

By further example, in *Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 283–84, 532 N.Y.S.2d 234, 236, 528 N.E.2d 157 (1988), the New York State Court of Appeals affirmed an appellate reversal of a plaintiff's jury verdict on false arrest and malicious prosecution claims, resulting from a victim's identification of plaintiff as the man who raped her. The officer's reliance on the victim's identification was reasonable and presumptively valid, and only if there was a showing of fraud, perjury or suppression of evidence by the police could the presumption be rebutted. *Id.*

■ In *Gisondi*, the victim initially described the assailant as approximately 35 to 40 years of age, however, although the assailant was positively identified from a photo array, he was only 19 years of age at the time of the rape. There was also a discrepancy in the victim's description as it pertained to the model of automobile involved. These discrepancies were not disclosed to the court when the officer obtained an arrest warrant. In addition, the purported assailant provided an alibi and witnesses thereto, which the police did not investigate. In find-ing these alleged wrongdoings insufficient to constitute fraud, perjury or improper concealment, the court noted the following relevant legal principles. "The police and prosecutors are not required to disclose all of their evidence in an application for an arrest warrant or at a felony hearing (*see, e.g.,* CPL 120.20, 180.70; *People v. Hodge*, 53 N.Y.2d 313, 318–19, 441 N.Y.S.2d 231, 423 N.E.2d 1060 (1981)), and are not generally required to disclose all discrepancies or potential weaknesses in the case uncovered during the investigation." *Gisondi*, 72 N.Y.2d at 285, 532 N.Y.S.2d at 237, 528 N.E.2d 157; *see also United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir.) (finding Government had "no obligation to present exculpatory material to a grand jury") (citing *United States v. Williams*, 504 U.S. 36, 51–52, 112 S.Ct. 1735, 1744–45, 118 L.Ed.2d 352 (1992)), *cert. denied*, 521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997).

The discrepancies often encountered in police investigations may "impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime." *Gisondi*, 72 N.Y.2d at 285, 532 N.Y.S.2d at 237, 528 N.E.2d 157. Accordingly, the court found as a matter of law that plaintiff failed to establish a prima facie case of fraud or concealment on the part of the police and therefore the presumptive validity of probable cause and the arrest was preserved. *Id.* at 286, 532 N.Y.S.2d at 238, 528 N.E.2d 157.

Lewis concluded that he had probable cause to arrest Carson on burglary and kidnapping charges. This conclusion was reinforced when the first Grand Jury indicted Carson on one count of burglary in the second degree. *See, e.g., Bordeaux v. Lynch*, 958 F.Supp. 77, 82 (N.D.N.Y.1997) (finding indictment which was eventually dismissed still conveyed a presumption of probable cause when first indicted); *Woodard v. Hardenfelder*, 845 F.Supp. 960, 967 (E.D.N.Y. 1994) (holding that a grand jury indictment establishes, at the very least, a presumption of probable cause). This is because a grand

jury must find by competent and admissible evidence that there is reasonable cause to believe that the person charged committed the offense charged before returning an indictment. *See* N.Y. Penal Law § 190.65(1) (McKinney 1993).

In the instant action, the Plaintiffs place ample emphasis on the fact that the victim, Judith Monroe, accompanied detectives of the narcotics unit on July 13, 1992, in an investigation in which her vehicle was wired for sound and the transmissions were monitored and taped. Detective Susan Carroll of the narcotics unit testified that she destroyed the tape later that day because the tape was inaudible and had failed to record the conversation. Detective Lewis testified that he was unaware of the recording or its contents. Although Carson may allegedly have had prior involvement in the targeted drug transactions, the failure of the undercover investigation does not lead to the conclusion that evidence exculpating Carson of the burglary and kidnapping charges was disclosed. In addition, the police cannot be expected to retain inaudible tapes of covert recordings which are extraneous to their ongoing drug investigation. *See Labensky,* 6 F.Supp.2d at 175 (finding "police officers' belated disclosure to the prosecutor of the five tape recordings ... cannot amount to a constitutional violation"). Moreover, there is no evidence suggesting that Detective Lewis was aware of the tape recording or the extent of the cooperative efforts undertaken by Monroe and the narcotics unit, in fact, Lewis' deposition testimony reveals that he was unaware of the taping or of any statement provided by Monroe to the narcotics unit, and Chief Blomberg testified at a deposition that he was unaware of the existence of the tape.

■ Under New York's "fellow officer rule." "an arresting officer is deemed to act with probable cause when making an arrest at the direction of another law enforcement officer who has the requisite probable cause." *People v. Rosario,* 78 N.Y.2d 583, 588, 578 N.Y.S.2d 454, 457, 585 N.E.2d 766 (1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 448 (1992); *see also United States v. Canieso,* 470 F.2d 1224, 1230 n. 7

(2d Cir.1972) (" 'In a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest.' ") (quoting *Williams v. United States,* 308 F.2d 326, 327 (D.C.Cir. 1962)). However, it does not follow that the sum of information known to all fellow officers is necessarily imputed to the arresting officer at the time of the arrest. To impose such a onus burden on every officer charged in a civil suit would effectively convert a Section 1983 cause of action into a fishing expedition. The probable cause inquiry contemplates the information known to the arresting officer at the time of arrest, and viewed as such, Detective Lewis' arrest of Earl Carson was valid and was not in derogation of his constitutional rights.

■ As a separate concern, the fact that a Grand Jury subsequently declined to indict Carson is not dispositive on the question of probable cause because the initial indictment provided the presumption of probable cause. In *Gisondi,* the court held that the victim's identification of the purported perpetrator creates a presumption of probable cause "which is not overcome by the fact that the Grand Jury later voted to dismiss the charges." 72 N.Y.2d at 284, 532 N.Y.S.2d at 236, 528 N.E.2d 157; *see also Phillips v. Corbin,* 132 F.3d 867, 869 (2d Cir.1998) ("Although we have not previously ruled on this issue, we now hold that the grand jury's refusal to indict Phillips does not, as a matter of law, establish that the officers lacked probable cause to arrest her."); *Greiner v. County of Greene,* 811 F.Supp. 796, 797 (N.D.N.Y.1993) (Grand Jury returned a "No Bill," however, arresting sheriff was entitled to qualified immunity); *Vonritter v. Town of Bethel, Ct.,* No. 91–CV–612, 1993 WL 83291, at *3 (N.D.N.Y. Mar.15, 1993) (finding existence of probable cause to arrest although three months later the grand jury returned a "no bill").

■ Moreover, once probable cause is established the police do not have to endeavor to negate it. *See Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433 (1979); *Krause v. Bennett,* 887 F.2d 362,

372 (2d Cir.1989); *Bassett v. Ferrucci,* No. 94–CV–655, 1996 WL 347207, at *4 (N.D.N.Y. June 19, 1996); *Gonzalez v. City of New York,* No. 94–CIV–7377, 1996 WL 227824, at *8 (S.D.N.Y. May 3, 1996); *Dukes v. City of New York,* 879 F.Supp. 335, 341 (S.D.N.Y.1995) ("Even if the basis of the arrest could have dissipated, subsequent to the arrest ... such an occurrence does not eliminate the probable cause that existed at the time of the arrest.").

██ With respect to Chief Blomberg, Plaintiffs claim that "[a]t all times indicated herein, Detective William Lewis was operating under the supervision of Chief Thomas Blomberg and other superior officers of the Suffolk Police Department." (Pls.' Compl. ¶ 21.) Plaintiffs further claim that Chief Blomberg was present while Detective Sergeant Pepper advised Assistant District Attorney William Ferris that based upon his investigation, Earl Carson should be immediately released. (Pls.Compl.¶¶ 82, 83.) Finally, Plaintiffs contend that "[d]espite the objective unreasonableness of the arrest and continued detention of Earl Carson, no further investigation was conducted by Chief Thomas Blomberg or the detectives under his command." (Pls.' Compl. ¶ 86.)

██ Assuming *arguendo* a constitutional violation occurred, these allegations do not state a claim for relief against Chief Blomberg pursuant to Section 1983 which imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (quoting *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)). A prerequisite to § 1983 liability is the personal involvement of the defendant in the alleged constitutional deprivations. *Id.,* 781 F.2d at 323. The Second Circuit has provided four situations under which a supervisory official is personally involved in a constitutional violation. A supervisor is personally involved when he or she: (1) directly participated in the violation; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) created a custom or policy fostering such violations, or allowed such a custom or policy

to continue; or (4) was grossly negligent in managing subordinates who caused the violation. *Williams,* 781 F.2d at 323–24.

In its essence, this case involves law enforcement personnel drawing divergent opinions as to the credibility of the witnesses and the viability of the criminal charges. Detective Lewis' decision, whether ultimately found to be accurate or not, did not constitute a violation requiring immediate supervisory remedial action.

Moreover, and quite meaningful, once the arrest was effectuated it became the responsibility of the District Attorney's office to determine the contours of the prosecution and the necessity, if any, of a continued investigation. This control includes whether, and to what extent, witnesses and evidence are included in the grand jury presentation. Therefore, to the extent that post-arrest exculpatory information was discovered by members of the SCPD and provided to the District Attorney's office, its evaluation and use was within the prosecutor's dominion. *See Johnston v. Town of Greece,* 983 F.Supp. 348, 358 (W.D.N.Y.1997) ("Once Johnston was indicted, responsibility for his prosecution shifted from the FBI to the United States Attorney's Office."). And, it is undeniable that "[p]rosecutors are entitled to absolute immunity from suits for damages arising from activities that are 'intimately associated with the judicial phase of the criminal process,'" *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987) (citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), and having realized as much, the parties stipulated to the discontinuance of the prosecutorial defendants as parties to this action. Ultimately, Chief Blomberg's involvement did not rise to a level which would warrant the imposition of personal liability. Still, irrespective of personal involvement, because the Court has concluded that Plaintiffs' constitutional rights were not violated, no liability lies against any of the Defendants for the arrest of Earl Carson.

## III. MALICIOUS PROSECUTION

██ Under New York law, malicious prosecution claims have four elements: "(1)

the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Russell*, 68 F.3d at 36. In addition, the alleged violation must have been effectuated "pursuant to legal process." *Singer*, 63 F.3d at 116–17 (quoting *Heck v. Humphrey*, 512 U.S. 477, 484, 114 S.Ct. 2364, 2371, 129 L.Ed.2d 383 (1994)).

An indictment is the legal process commencing the prosecution when an arrest is effectuated without a warrant. Therefore, Carson's arrest on burglary and kidnapping charges cannot, for purposes of a malicious prosecution claim, "serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not pursuant to legal process." *Singer*, 63 F.3d at 116 (internal quotations and citations omitted). For malicious prosecution purposes, consequently, the determination of probable cause is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of the arrest. *See Dukes*, 879 F.Supp. at 342. However, a malicious prosecution claim will be defeated by a finding of probable cause to arrest, unless the plaintiff can demonstrate mitigating facts to vitiate probable cause which were first uncovered after the arrest. *See id.* The first Grand Jury did indict Earl Carson and therefore there was a presumptive finding of probable cause at the commencement of the prosecution which has not been refuted by evidence that the individual defendants withheld, misrepresented or falsified evidence or otherwise acted in bad faith. *See White v. Frank*, 855 F.2d 956, 961–62 (2d Cir.1988). In addition, the Second Circuit has held that a claim of malicious prosecution, as well as claims related to plea agreements, are within the judicial phase of a criminal prosecution. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1149 (2d Cir.1995); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir.1995). As previously mentioned, the parties have stipulated to discontinue the action against the defendants from the district attorney's office, who are immune from suit. Having determined that probable cause existed at the commencement of the prosecution, the malicious prosecution claim must also fail.

## IV. ILLEGAL SEARCH

Plaintiffs contest the constitutionality of the residential search. "A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir.1991). A reviewing court accords " 'great deference' to a judge's determination that probable cause exist[ed], and we resolve any doubt about the existence of probable cause in favor of upholding the warrant." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir.1998) (citing *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir.1992)). "When an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." *Laaman v. United States*, 973 F.2d 107, 115 (2d Cir.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *see also United States v. Lace*, 669 F.2d 46, 48–49 (2d Cir.), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). Any omitted information must be shown to be material and necessary to a finding of probable cause to refute the presumption of good faith. *Golino*, 950 F.2d at 871. "In the context of a criminal case, where a magistrate has found that an affidavit presented to him showed that there was probable cause for the issuance of a warrant, a challenge to the veracity of the affidavit merits a hearing only if the challenger makes a 'substantial preliminary showing' that the affiant knowingly and intentionally made a false statement ... [that] was 'necessary to the finding of probable cause.' " *Id.* at 604 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). Then the court must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause. If probable cause remains, no constitutional violation of plaintiff's Fourth Amendment

rights has occurred." *Soares v. Connecticut,* 8 F.3d 917, 919 (2d Cir.1993) (citing *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992)).

■ The information presented in support of the application for the search warrant pertaining to the alleged rape included the sworn statements of Monroe and the information provided in the hospital medical records of the examination of Judith Monroe. The information presented in support of the application for the search warrant for guns and stolen property included the sworn statements of Duffett and Monroe and the detective's investigation results. Ultimately, approximately 160 tapes were recovered from the residence, however, it is unclear whether they were positively identified as stolen.

Judith Monroe was taken to the Brookhaven Memorial Hospital by the SCPD at approximately 5 p.m. on July 13, 1992, where she was examined, treated and released. Based upon Monroe's allegations, Detective Lewis applied for and received a search warrant for 905 Sipp Avenue, to recover evidence of a sexual attack on Monroe, signed by the Honorable Lawrence Donohue of First District Court.

Plaintiffs suggest that it was objectively unreasonable for Defendants to credit Monroe's allegations of rape in light of her hospital records, and that Lewis intentionally provided false information in support of the search warrant, to wit, Judith Monroe sustained a tear to the cervical wall in the incident. A review of Brookhaven Memorial Hospital's medical records, however, indicates support for Monroe's claim of rape. Monroe was treated and released and was administered 5 mg. of Valium. The report indicates that the diagnosis/impression of the treating physician was "Rape, assault" and the physical examination revealed "Rape kit completed ... early bruising below left breast, inflammation and mild swelling noted ... perineum no actual tears noted ... pelvic—thin yellow discharge ... large cervical polyp noted, very pliable". Anal region tears noted. The triage nurse recorded "pain pubic bone—spotting blood."

In addition, Monroe reported that she observed numerous weapons and purportedly stolen video tapes at the residence, which was buttressed by Carson's alleged supporting statements to Monroe. Accordingly, the information provided by Detective Lewis in his applications for the two search warrants provided a fair assessment of the information known to him at the time of the application. Parsing any and all discrepancies from the application and affidavit for the search warrants does not result in an application devoid of probable cause, and therefore, Plaintiff's attack on the validity of the warrants is deficient as a matter of law.

## V. QUALIFIED IMMUNITY

■ Separate and apart from whether or not there was probable cause for Plaintiff Earl Carson's arrest and the search of the residence in question, Detective Lewis and Chief Blomberg have a valid defense of qualified immunity. Qualified immunity attempts to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Jemmott v. Coughlin,* 85 F.3d 61, 66 (2d Cir.1996) (internal quotations and citations omitted). To avoid the substantial social costs inherent in damage suits against government officials, summary dismissal is encouraged where qualified immunity obtains. *See Anderson,* 483 U.S. at 638, 640 n. 2, 107 S.Ct. at 3034, 3039 n. 2.

■ Public officials are entitled to qualified immunity from liability for damages as long as their conduct does not violate clearly established statutory or constitutional rights, *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or insofar as "it [is] objectively reasonable for them to believe that their acts d[o] not violate those rights." *Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994) (internal citation omitted). Thus, a police officer is entitled to qualified immunity as a matter of law if it was either (a) "objectively reasonable for the officer[ ] to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether

the probable cause test was met." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987). To overcome a qualified immunity defense, a plaintiff "must show it to be obvious that no reasonably competent officer would have concluded that a[n arrest] should issue." *Culberg,* 741 F.Supp. at 81 (quoting *Robison,* 821 F.2d at 921). Thus, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040).

 It is well-settled that a person has an established right not to be arrested or prosecuted without probable cause. *Golino,* 950 F.2d at 870. Having concluded as a matter of law that there was probable cause to arrest Carson, *a fortiori,* Lewis and Blomberg are entitled to qualified immunity, a conclusion this Court would reach even if the existence of probable cause was not conclusively found.

Assuming probable cause was not established, the issue presented is could reasonable officers disagree as to whether probable cause was present? In "evaluating probable cause for an arrest, [the court] must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996). Here, reasonable officers could not conclusively agree that probable cause did not exist at the time Carson was arrested, based on the facts then known to Detective Lewis, and accordingly Defendants Lewis and Blomberg are qualifiedly immune from Carson's constitutional claims. *See Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997) (although State Troopers "did not in fact have actual probable cause to arrest the plaintiff, they certainly had 'arguable' probable cause, and accordingly, it was objectively reasonable for the State Troopers to believe that probable cause existed."); *see also Hunter,* 502 U.S. at 228, 112 S.Ct. at 537 ("the court should ask whether the agent acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events could be [subsequently] constructed").

As Detective Lewis relied predominately upon the evidence as sworn to by Duffett and Monroe, the arrest of Carson and the application for the warrants to search the residence were objectively reasonable. The disparity of opinion between Lewis and Pepper as to the credibility of the victim and witnesses, and the existence of probable cause, is an example of the factual circumstances for which the defense of qualified immunity was intended, because, reasonable officers disagreed, and therefore, the arresting officer's objective reasonable conclusion that probable cause existed at the time of arrest, based upon the facts then known to the officer, is protected from suit.

Chief Blomberg's reliance upon the conclusions drawn by the detective assigned to the investigation was also objectively reasonable, notwithstanding Detective Sergeant Pepper's protestations and contradictory conclusions.

 With respect to Plaintiffs' challenge to the search warrants issued for their residence, Defendants Lewis and Blomberg are likewise entitled to qualified immunity. A police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity from personal liability for damages. *Golino,* 950 F.2d at 870; *see also Brown v. D'Amico,* 35 F.3d 97, 99 (2d Cir.1994) (finding the constitutional right as "the right to be free from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause"). Police activity conducted pursuant to a warrant rarely will require "any deep inquiry into reasonableness" because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith. *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). However, "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable." *Id.* The court's role

is limited to ascertaining whether a reasonable officer would have known that the warrants were illegal despite the magistrate's authorization. *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23. Once again, reliance upon the sworn testimony of the purported victim and a witness thereto is objectively reasonable and constitutes protected police activity.

## VI. MUNICIPAL LIABILITY

Having determined that Carson's constitutional rights were not violated, there can be no cognizable claim against the municipality. *See, e.g., Labensky,* 6 F.Supp.2d at 178 (holding plaintiff having failed to prove a violation of her constitutional rights, there can be no municipal liability); *Campanaro v. City of Rome,* 999 F.Supp. 277, 282 (N.D.N.Y.1998) (granting summary judgment and dismissing complaint alleging false arrest, malicious prosecution and municipal liability).

■ Even assuming for the sake of argument that Carson's Fourth Amendment rights were violated, Suffolk County would not be liable. To assert a claim against a municipality for the deprivation of constitutionally protected rights, the plaintiff must allege that the injury resulted from a policy or custom of the municipality. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1386, 137 L.Ed.2d 626 (1997) (quoting *Monell,* 436 U.S. at 692, 98 S.Ct. at 2027).

■ A plaintiff will not prevail against a municipality on a theory of respondeat superior or vicarious liability. *Monell,* 436 U.S. at 692–94, 98 S.Ct. at 2036–37. Thus, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the mu-

nicipality is not held liable solely for the actions of its employees." *Bryan County,* 117 S.Ct. at 1389 (citing *Canton v. Harris,* 489 U.S. 378, 391–92, 109 S.Ct. 1197, 1206–07, 103 L.Ed.2d 412 (1989)). "At the very least there must be an affirmative link between the policy and particular constitutional violation alleged." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Therefore, absent an officially adopted rule or an action directly attributable to a municipal policymaker, "proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell....* " *Id.* at 823–24, 105 S.Ct. at 2436.

■ Plaintiffs must allege "facts to support their contention that the challenged actions were in any way related to a custom or policy promulgated by the [municipality]." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir.1993). Additionally, conclusory allegations of misconduct are not sufficient evidence of municipal policy or custom. *See, e.g., Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (the "mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference"); *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991) ("an allegation of municipal policy or custom would be insufficient if wholly conclusory").

■ Plaintiffs raise numerous allegations in support of their claim of municipal liability, including, that it was the policy and practice of the Suffolk County Police and the Suffolk County District Attorney's office: (1) to consider black citizens as less deserving of the constitutional guarantees of due process, equal protection, freedom from unreasonable search and seizure, and freedom from cruel and unusual punishment (Pls.' Compl. ¶ 25.); (2) to consider black citizens with criminal records as less deserving of the constitutional guarantees of due process, equal protection, freedom from unreasonable search and seizure, and freedom from cruel and unusual punishment (Pls.' Compl. ¶ 26.); (3) to consider low income area residences of black

citizens as less deserving of the right to be free from unreasonable searches and seizures (Pls.' Compl. ¶ 27.); (4) to consider the residences of black citizens with minor criminal records as less deserving of the right to be free from unreasonable searches and seizures (Pls.' Compl. ¶ 28.); (5) and specifically the practice of the Suffolk County Police Department to allow for the application for search warrants and the use of police personnel in executing search warrants which are known to be or with a reasonable degree of certainty should be known to be of no law enforcement value in the pursuit of overtime payments to police personnel (Pls.' Compl. ¶ 36.); (6) and specifically the practice of the Suffolk County Police Department to allow for the application for search warrants on the statements of civilians who are known to be unreliable to the Police Department but who are indicated as worthy of belief in representations by police personnel to judges (Pls.' Compl. ¶ 37.); (7) to fail to properly discipline, restrict and control employees known to be irresponsible with administrative, investigative, and prosecutorial duties tendered; (Pls.' Compl. ¶ 133(a).); (8) to fail to take adequate precautions in the hiring, training, assignment and retention of police and prosecutorial personnel so as to minimize and eliminate the violation of constitutional rights of the citizenry, especially as regards to black Americans (Pls.' Compl. ¶ 133(b).); (9) to fail to take adequate measures including the filing of criminal charges as against police and prosecutorial personnel who violate the constitutional rights of American citizens (Pls.' Compl. ¶ 133(c).); (10) to fail to establish and ensure the functioning of a meaningful and effective police department and District Attorney office system for dealing with complaints of police and prosecutorial misconduct (Pls.' Compl. ¶ 133(d).); and (11) to fail to create a meaningful and reasonably available objective review process within or outside the Police Department and District Attorney's office for dealing with complaints of police and prosecutorial misconduct.

 Bald accusations, whether individually directed or in the form of broad sweeping institutional indictments, have no evidentiary value absent sworn affidavits providing factual support. *See, Covington v. City of New York,* No. 94–Civ. 4234 (SAS), 1998 WL 226183, at *4 (S.D.N.Y. May 4, 1998) (dismissing claim based on numerous conclusory allegations of municipal liability absent factual probative support).

Plaintiffs' counsel has submitted a document entitled "Witnesses Summaries" which might be useful to help decide the relevancy, and ultimately the admissibility, of potential witnesses at the pre-trial stage, however, it has no role when offered in opposition to a motion for summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure specifically requires the court to consider only "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in rendering a decision. With respect to affidavits, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Fed. R.Civ.P. 56(e).

## A. THIRD PARTY COMPLAINT

 With respect to admissible evidence presented in opposition to summary judgment, Plaintiffs provide a section of a single complaint brought against, *inter alia,* Defendant William Lewis and the SCPD. A review of the status of the complaint reveals that the matter has been discontinued on settlement with prejudice. Absent more, no negative inferences can be drawn from the settlement of an unrelated case. Although similar assertions were raised, settlement may have been based on specific illegal conduct by one of the named officers unrelated to a policy or practice of the municipality, or, as is often the case, settlement for "nuisance value" may have been made for questionable conduct, to avoid the time and expense of suit.

Moreover, this sole complaint cannot suffice to establish a policy or practice in a municipality as large as Suffolk County. *See, e.g., Sarus v. Rotundo,* 831 F.2d 397, 402

(2d Cir.1987) (finding a number of resisting arrest charges filed by police did not suggest policy of indifference to excessive use of force where plaintiff failed "to adduce evidence of the circumstances surrounding those arrests, or even to present corresponding figures from other police departments"); *Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 311 (S.D.N.Y.1998) (granting summary judgment on *Monell* claim because three complaints of alleged excessive use of force do not demonstrate deliberate indifference to use of excessive force); *Fincher v. County of Westchester,* 979 F.Supp. 989, 1006 (S.D.N.Y.1997) (granting summary judgment on *Monell* claim although two prior complaints against the municipality were settled requiring additional officer community relations training and in the face of claims of failure to train, supervise and investigate); *Mendoza v. City of Rome,* 872 F.Supp. 1110, 1118–19 (N.D.N.Y.1994) ("claims . . . filed against the City, standing alone, do[ ] not establish a pattern, policy, or practice which [is] causally related to the . . . use of excessive force upon the plaintiff . . . [and does] not constitute evidence of violation of Constitutional rights"); *Stengel v. City of Hartford,* 652 F.Supp. 572, 574 (D.Conn.1987) (dismissing *Monell* claim where two prior civilian police brutality complaints were lodged against the officer involved); *cf. Fiacco v. City of Rensselaer,* 783 F.2d 319, 329 (2d Cir.1986) (allowing evidence of seven claims of police brutality against the department in the previous five years), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Of course, seven claims in the small municipality of Rensselaer, encompassing less than thirty police officers, may have statistical significance. Suffolk County, on the other hand, had in excess of 2300 police officers in 1992.

### B. STATE INVESTIGATION COMMISSION REPORT

■ In addition, Plaintiffs have submitted a copy of excerpts from a State of New York, Commission of Investigation Report entitled "An Investigation of the Suffolk County District Attorney's Office and Police Department," (hereinafter the "SIC Report"), dated April 1989. The extracts of the SIC Report include specific findings which, if germane to the instant action, would support allegations that SCPD detectives have previously failed to properly document their investigations which has resulted in the concealing of misconduct and the preventing of necessary discovery in civil and criminal cases and that there had been a breakdown of supervision in SCPD narcotics investigations which permitted illegal wiretapping and lack of proper controls on informants.

On prior occasions, as could be expected, attempts have been made to introduce the SIC Report in support of a claim of municipal liability. In fact, the very issue of admissibility of sections of the SIC Report was decided in this district more than eight years ago by Judge Weinstein. *See Gentile v. County of Suffolk,* 129 F.R.D. 435 (E.D.N.Y. 1990), *aff'd,* 926 F.2d 142 (2d Cir.1991). Although this Court's conclusion with respect to the admissibility of the SIC Report is at variance with Judge Weinstein's, temporal case-specific distinctions dictate this result.

In *Gentile,* portions of the SIC Report were admitted because it would have "a tendency to establish a policy, practice, or custom or usage of inadequate investigation and discipline of employee misconduct." *Id.* at 447. The opinion traces the history and mandate of the investigative commission, and the genesis of the Suffolk County investigation. *Id.* at 442. Specifically, the investigation centered on activity occurring as far back as the mid–1970's and into the late 1980s. *Id.* The incident in question in *Gentile* occurred in July 1981, in the midst of the period detailed in the SIC Report.

For the SIC Report to be an admissible exception to the hearsay rule pursuant to Federal Rule of Evidence 803(8) required the court to assess its trustworthiness. In so doing, the first factor to be considered is timeliness. *Id.* at 450. Although the SIC Report investigation commenced four years after the incident in *Gentile,* the investigation was centered on activities occurring during the time period preceding and succeeding the incident. Whereas Carson's arrest occurred in July of 1995, more than six years after the SIC Report was issued and even further

removed from the incidents upon which the report was based.

Anticipating the use of his decision as a sword against Suffolk in subsequent litigation, Judge Weinstein's conclusion is worth repeating:

Defendant Suffolk County need not be concerned that our decision will amount to an open season for section 1983 cases based on police or prosecutorial misconduct. Each case will be considered by the trial judges of this district with sensitivity to the needs of both plaintiffs and the County.... Finally, the SIC report has limited application, if any, to incidents occurring outside the 1981–1988 period.

*Id.* at 462.

Accordingly, the SIC Report would not be admissible at trial in support of Plaintiff's *Monell* claim and therefore it cannot be considered in opposition to summary judgment. It is important to emphasize that this conclusion is not inconsistent with the Second Circuit's sweeping statement that "admissibility of evidence of this sort is generally favored" in its divided affirmance of Judge Weinstein's decision. *Gentile v. County of Suffolk,* 926 F.2d 142, 148 (2d Cir.1991). Rather, the passage of time between the issuance of the SIC Report and the events in question sufficiently attenuates its trustworthiness and renders it inadmissible. To admit an out-of-date report in support of municipal liability would discourage voluntary disclosure and affirmative self-inquiry into police misconduct by other municipalities, and would advance an ineffectual public policy.

Nevertheless, because I find that the underlying actions of Detective William Lewis were both authorized by a facially valid search warrant, and supported by probable cause, Plaintiffs' allegations of an unconstitutional municipal custom or policy also fails, and therefore, Plaintiffs' claims against Suffolk County are dismissed.

## VII. SECTION 1981 CLAIM

Plaintiffs also allege claims pursuant to 42 U.S.C. § 1981 which provides in relevant part:

All persons within the jurisdiction of the United States has shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exaction of every kind, and to no other.

■■■ To state a § 1981 claim, plaintiffs must allege facts to establish: (1) membership in a racial minority group; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). Mere conclusory allegations do not suffice to support a § 1981 claim. *See Yusuf v. Vassar College,* 35 F.3d 709, 713–14 (2d Cir.1994).

■■■ In its general application, "[s]ection 1981 has been construed as a prohibition against racial discrimination." *Yusuf v. Vassar College,* 827 F.Supp. 952, 955 (S.D.N.Y. 1993) (citing *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 608–10, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)), *aff'd in part and rev'd in part on other grounds,* 35 F.3d 709 (2d Cir.1994). However, the discrimination must have been intentional and purposeful and the plaintiff's race must have been the motivating factor behind the defendants discriminatory acts. *See Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988). "[N]aked assertion[s] by plaintiff[s] that race was a motivating factor without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race [are] too conclusory...." *Yusuf,* 827 F.Supp. at 955 (internal citations omitted).

Plaintiffs' allegations with respect to the Section 1981 claims are that Plaintiffs Earl Carson and Lydia Rivers are black Americans who suffered punishment different than that accorded white citizens and suffered pains and exactions unlike those requested of white citizens and were denied the full and equal benefits of all laws and proceedings for

the security of persons and property. (Pls.' Compl. ¶¶ 136–39.) Because the Court has concluded that Defendants' conduct did not violate Plaintiffs' constitutional rights, and therefore Plaintiffs were not discriminated against, this cause of action must fail. *See, e.g., Daniels v. City of Binghampton,* No. 3:95–CV–688, 1998 WL 357336, at *6 (N.D.N.Y. June 29, 1998) (summary judgment granted because, in part, no specific acts were shown supporting racial animus other than general conclusory allegations); *Peterson v. Saracenci,* No. 3:95–CV–2624(AHN), 1997 WL 409527, at *5 (D.Conn. July 16, 1997) (summary judgment granted because there was no clear showing that race played a role in the incident). Accordingly, Plaintiffs' claims pursuant to 42 U.S.C. § 1981 are dismissed with prejudice.

## VIII. SECTION 1985 CLAIM

■ Section 1985 prohibits conspiracies to interfere with a person's civil rights. *Griffin v. Breckenridge,* 403 U.S. 88, 102–04, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). A valid claim must allege the facts and circumstances of the alleged conspiracy. *See Mass v. McClenahan,* 893 F.Supp. 225, 231 (S.D.N.Y.1995). Plaintiffs' claims pertaining to conspiracy are that "the presentation to the grand jury was merely an item in a conspiracy designed to embarrass, transfer and ostracize Detective Pepper, and incidentally, to charge and punish Earl Carson for invented transgressions of the Penal Law [and] defendants Catterson, Ferris and Blomberg participated in a conspiracy to embarrass, transfer and ostracize Detective Pepper for outlining the inadequacy and in-

tentional misconduct of law enforcement personnel in, among other cases, the Carson case." (Pls.' Compl. ¶¶ 91, 92.) Plaintiff further alleges that the Defendants' actions were pursuant to a conspiracy and that the Defendants were aware of the lack of objective reasonableness of the charges against Earl Carson. (Pls.' Compl. ¶¶ 162, 163.) Further, that Defendant William Lewis filed false documents indicating that charges as against Earl Carson were valid. (Pls.' Compl. ¶ 164.) Finally, that Defendant Thomas Blomberg was aware of the exculpatory information revealed by Detective Sergeant Pepper's phone conversation of July 14, 1992 and deliberately acquiesced in the conduct of William Lewis and others, and that Defendant Thomas Blomberg suppressed the prosecution of Judith Monroe for filing a false statement under the Penal Law and suppressed any internal affairs investigation of the activities of police department personnel in the preparation of the search warrant application, filing of Burglary charges as against Earl Carson, and the suppression of exculpatory information. (Pls.' Compl. ¶¶ 171, 172, 173.)

■ The applicable statute [1] has been interpreted by the courts to require a plaintiff to prove the following in order to state a civil rights conspiracy under § 1985:(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of a constitutional right. *See Unit-*

---

1. (3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election

of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
42 U.S.C. § 1985(3).

*ed Bhd. of Carpenters v. Scott,* 463 U.S. 825, 829–30, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Mian,* 7 F.3d at 1087–88 (2d Cir.1993); *Gray v. Town of Darien,* 927 F.2d 69, 72 (2d Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991). "In the context of a § 1983 claim, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, where those persons agree to inflict an injury upon another and where there is an overt act resulting in damages." *Covington,* 1998 WL 226183, at *4 (citation omitted). "The scope of § 1985(3) is narrower than that of § 1983." *Blankman v. County of Nassau,* 819 F.Supp. 198, 205 (E.D.N.Y.), *aff'd,* 14 F.3d 592 (2d Cir.1993). Further, it must be shown that the conspiracy was "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian,* 7 F.3d at 1088 (quoting *Scott,* 463 U.S. at 829, 103 S.Ct. at 3356).

As previously noted, Plaintiffs has failed to produce any evidence whatsoever, beyond conclusory statements, that Detective Lewis arrested Carson and/or searched the Carson/Rivers residence because of the Plaintiffs' race. *See, e.g., Presnick v. Berger,* 837 F.Supp. 475, 480 (D.Conn.1993) (granting summary judgment for defendants on § 1983(5) claim where "plaintiff failed to make any factual allegations to support a claim of a civil rights violation" and "there is no evidence whatsoever on this record of any racial or otherwise class-based invidiously discriminatory animus.").

As is prevalent throughout Plaintiffs' affidavits in opposition to summary judgment, the underlying contention is a conspiracy against Detective Sergeant Pepper, a non-party in the instant action, and raises issues irrelevant herein.

Nonetheless, because the Court has determined that Plaintiffs' constitutional rights have not been violated, the conspiracy claim cannot lie and accordingly Plaintiffs' claims pursuant to 42 U.S.C. § 1985(3) are dismissed with prejudice.

All other allegations raised are similarly without merit and are dismissed with prejudice.

## IX. OVERVIEW

In sum, Plaintiffs' opposition to Defendants' motion for summary judgment consists of snippets of inconsistencies or errors committed by the SCPD, couched in conspiratorial allegations. In hindsight, the investigation into the allegations of kidnapping, burglary and rape advanced by Judith Monroe could have been handled in a more professional and thorough manner. There were incomplete and sloppy police investigatory techniques utilized. However, considered individually or collectively, these matters are neither particularly relevant to the instant motion nor do they constitute genuine issues of material fact sufficient to deny Defendants' motion for summary judgment. Not every constable's blunder rises to the level of an actionable constitutional violation.

Accordingly, the record is clear that there is no disputed issue of fact as to whether there was probable cause to arrest Earl Carson or to search the Carson/Rivers residence. In addition, no reasonable jury could find that, under the circumstances, it was objectively unreasonable for individual Defendants Detective William Lewis and Chief Thomas Blomberg to believe that there was probable cause to arrest the Plaintiff Earl Carson and to make application for a warrant to search the Plaintiffs' residence at 905 Sipp Avenue.

## CONCLUSION

Therefore, for all the aforementioned reasons, it is hereby Ordered that Defendants' motion for summary judgment is granted in its entirety. The Court having determined that probable cause existed as a matter of law to arrest Earl Carson and to make application for a warrant to search the joint residence of Earl Carson and Lydia Rivers, Plaintiffs' false arrest and malicious prosecution claims are dismissed with prejudice. In addition, because Plaintiffs' constitutional rights were not violated, the claims pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 are all dismissed with prejudice, as are all the

272

claims against Defendant Suffolk County. As a separate and independent grounds for dismissal, Defendants Lewis and Blomberg are entitled to qualified immunity because the underlying arrest and search were objectively reasonable. Further, the claims of municipal liability against Defendant Suffolk County are also dismissed on independent grounds for Plaintiffs' failure to raise genuine issues of material fact.

Accordingly, Plaintiffs' complaint is dismissed with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED.