**UNITED STATES of America,**

v.

**Johnny TAVAREZ, Defendant.**

**No. 96 CR. 895 SWK.**

United States District Court,
S.D. New York.

March 9, 1998.

Michael A. Rogoff, U.S. Attorney's Office, Mary Jo White, U.S. Atty., New York City, for U.S.

David Touger, Peluso & Touger, New York City, for Johnny Tavarez.

*MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

Defendant Johnny Tavarez ("Tavarez") moves to suppress physical evidence seized from his apartment following a search and statements made by him following his arrest, alleging that law enforcement officers violated his constitutional rights under the Fourth and Sixth Amendments. The Court held an evidentiary hearing on these claims on February 4 and 5, 1998. For the reasons set forth below, Tavarez's motion to suppress is denied.

## BACKGROUND

On March 6, 1995, the New York City Police Department obtained a warrant to search Tavarez's apartment, located on the third floor at 603 West 185th Street in Manhattan, for cocaine and drug-related evidence. The warrant was a "no-knock" warrant, meaning that the police were not required to knock and announce themselves before entering the apartment. *See* Search Warrant, dated March 6, 1995 ("Search Warrant"), attached to the Gov't's Mem. of Law as Exh. "B." On March 9, 1995, Officer Kevin Grogan ("Officer Grogan") and several other police officers executed the Search Warrant. It is undisputed that when the officers arrived at Tavarez's apartment, they neither knocked nor announced themselves before forcibly entering the apartment. Tavarez also claims that the police officers ransacked the apartment in a violent manner. Affidavit of Johnny Tavarez, sworn to Sept. 10, 1997, ("Tavarez Aff.") ¶ 2. During the search, the police officers found, inter alia, drugs, guns, ammunition, cash and drug records.

On September 26, 1996, a federal grand jury sitting in the Southern District of New York returned a one-count indictment charging Tavarez with conspiracy to distribute and to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 846. Thereafter, a warrant for Tavarez's arrest was issued. On December 17, 1996, at approximately 7:00 a.m., Tavarez was arrested in Apartment 5A at 571 Academy Street, in Manhattan. Suppression Hearing Transcript ("Tr.") at 73. Special Agent David Higgins ("Higgins") of the Federal Bureau of Investigation ("FBI") supervised the arrest. Higgins was assisted by approximately six other law enforcement agents, including Special Agent Jose Flores ("Flores"). Tr. at 73. Once Tavarez was placed under arrest, Higgins sought his consent to search the apartment. According to Higgins, Tavarez orally consented to the search without incident and without requesting counsel, and executed a "consent to search" form, written in Spanish. Tr. at 75–76; Consent to Search Form, Gov't Exh. "3." Tavarez, however, claims that he repeatedly told Higgins and the other agents that he would not sign the consent to search form without the assistance of an attorney. Tr. at 167. Tavarez concedes that he eventually signed the form, but claims that it was only as a result of the agents' threats to arrest his girlfriend, Martina Nunez ("Nunez").[1] Tr. at 168. After a brief search, Tavarez was escorted out of the building. Tavarez claims that as he was being led out of his apartment he encountered his mother ("Mrs. Tavarez"), and told her, "Get me a lawyer. Get me a lawyer right now." Tr. at 170.

Tavarez was transported by motor vehicle to FBI headquarters, located at 26 Federal Plaza in Manhattan. Tr. at 77. Higgins testified that he sat in the rear seat, behind the driver, next to Tavarez while Flores drove the vehicle. Higgins explained that this seating configuration is routine in order to minimize danger to the driver because there is no protective shield between the front and rear seats. Tr. at 107. According to the Government, during the car ride of approximately one hour Tavarez was advised of his constitutional rights, in English by Higgins and in Spanish by Flores, and at no time requested the assistance of counsel. Tr. at 77–78. Tavarez contends that he was alone in the car with Higgins and was nearly silent during the car ride. Tr. at 171–73.

Upon arrival at FBI headquarters between 9:00 a.m. and 10:00 a.m., Tr. at 191, Tavarez was taken to an interview room, Tr. at 78. Higgins claims that with the assistance of Detective Enrique Santos he advised Tavarez of his constitutional rights in writing, both in

---

1. Although Tavarez and Nunez are referred to as husband and wife in various documents and at times during the suppression hearing, they are not actually married. Tr. at 220, 243.

English and Spanish. Tr. at 78. At approximately 9:45 a.m., Tavarez executed written a waiver of his constitutional rights in both English and Spanish. *See* Waiver of Rights in English, Gov't Exh. "4"; Waiver of Rights in Spanish, Gov't Exh. "5." The Government claims that while at FBI headquarters Tavarez did not ask to speak with an attorney. Tr. at 83. Tavarez claims that before he signed the waivers, he requested an attorney. Tr. at 174. In addition, Tavarez claims he remained in an interview room for "several hours," during which time Higgins was "putting on a lot of pressure." Tr. at 173.

On September 19, 1997, Tavarez filed the instant motion seeking to suppress (1) the physical evidence seized from his apartment located on the third floor at 603 West 185th Street in Manhattan, in March 1995; and (2) the statements he made after his arrest in December 1996. Tavarez argues that the search of his apartment violated his constitutional rights under the Fourth Amendment. In addition, Tavarez claims that admission of his post-arrest statements would violate his Sixth Amendment right to counsel.

## DISCUSSION

### I. Physical Evidence

Tavarez seeks to suppress the physical evidence seized from his apartment on two grounds: (1) that the police made an unannounced entry; and (2) that the police conducted the search in a violent manner.

### A. Unannounced Entry

 The Fourth Amendment provides that "[the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. Under the Fourth Amendment, police who are executing a search warrant are required to knock and announce themselves before forcibly entering the premises. *Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). Exceptions to this "knock and announce" requirement exist, where either (1) the circumstances present a threat of physical violence;

or (2) police officers have reason to believe that evidence is likely to be destroyed if advance notice were given. *Id.* at 936. Because felony drug cases frequently involve both of these circumstances, some courts had, until recently, dispensed with a case-by-case analysis and simply held that felony drug cases constitute a per se exception to the knock and announce requirement.

In *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997), the Supreme Court held that the Fourth Amendment does not permit a blanket exception to the knock and announce requirement for felony drug cases. Rather, the Court held that in order to justify a no-knock entry, the police must have a "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* at 1421. Although this showing is "not high," the police are required to meet it whenever the reasonableness of a no-knock entry is challenged. *Id.* at 1422.

In reaching this conclusion, the Supreme Court noted that the felony drug case exception to the knock and announce rule was overbroad. *Id.* at 1421. For example, police conducting a search may know that the drugs are of a type or in a location that make them impossible to destroy quickly. *Id.* In such a case, the governmental interest in preserving evidence may not outweigh the individual privacy interests intruded upon by a no-knock entry. *Id.* Thus, while felony drug investigations may often present circumstances warranting a no-knock entry, it is nonetheless "the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." *Id.*

In the present case, a no-knock warrant was issued approximately three days before the search was executed. New York State Supreme Court Justice Adlerberg issued the no-knock warrant based on the affidavit of Officer Grogan.[2] In his affidavit, Officer

---

2. The Court has been informed that minutes of the warrant application before Justice Adlerberg were never transcribed and the stenographic rec-

ord cannot be located. *See* Affirmation of Matthew Menchel, Assistant District Attorney, dated

Grogan stated that he had received the following information from a confidential informant: that "JD Johnnie" (now known as Johnny Tavarez) utilized his apartment to store and sell cocaine, Search Warrant Application, sworn to March 6, 1995, Gov't Exh. "1," ¶ 2; that on March 4, 1995, he observed two clear plastic bags each containing approximately five ounces of a white powder like substance in the bedroom area, *id.* ¶ 3; that on March 1, 1995, Tavarez indicated that he was out of cocaine, but that he intended to procure more in the immediate future, *id.* ¶ 4; and that on January 28, 1995, he observed approximately one and one-half kilograms of a white powder like substance in clear plastic in the bedroom area, *id.* Officer Grogan also stated that the confidential informant had experience in the illegal narcotics trade and that he could recognize cocaine by its appearance and that the confidential informant believed that the white powder seen in Tavarez's apartment was cocaine. *Id.*

The central issue before the Court is whether the aforementioned facts constitute a reasonable suspicion that evidence would be destroyed if the officers knocked and announced themselves before entering the premises. The Government argues that regardless of the testimony elicited at the suppression hearing the Court should find that as a matter of law, there was reasonable suspicion that the evidence could be easily and quickly destroyed. This contention is based on the fact that Justice Adlerberg signed the no-knock warrant. Under New York law, the standard for obtaining a no-knock warrant is virtually identical to that set forth in *Richards v. Wisconsin.* *See* N.Y.Crim. Proc. L. § 690.35(4)(b) (no knock provision warranted where "(i) the property sought may be easily and quickly destroyed or disposed of, or (ii) the giving of such notice may endanger the life or safety of the executing officer or another person"). Indeed, the standard under New York law is even higher: *Richards* only requires that

there be reasonable suspicion to believe that the evidence could be easily destroyed, whereas New York state law requires probable cause. Thus, according to the Government, because Justice Adlerberg found that there was probable cause to believe that evidence for which the police were searching could be easily destroyed, this Court should find, a fortiori, that the lower reasonable suspicion standard set forth in *Richards* has been met.[3]

The Court agrees with the Government that the no-knock warrant was justified by a reasonable suspicion that evidence, namely cocaine, could be easily and quickly destroyed if the officers announced themselves before entering the premises. The facts set forth in Officer Grogan's affidavit, as well as his testimony at the suppression hearing support a reasonable suspicion that the drugs could be easily disposed of absent a no-knock warrant. Specifically, Officer Grogan stated that the confidential informant had seen small quantities of drugs, namely one and one-half kilograms on one occasion and two plastic bags each containing approximately five ounces on another occasion. *See* Search Warrant Application, ¶¶ 3–4. In addition, the drugs were easily accessible, as they were sitting on top of a dresser in the bedroom area, stored in plastic bags and/or plastic wrapping. *Id.;* Tr. at 13. Finally, Officer Grogan testified that based on his training and experience, such small amounts of cocaine could be easily and quickly disposed of by a number of methods, including being flushed down the toilet, thrown out a window, or thrown into a pail of water in which they would dissolve. Tr. at 13. Because the drugs were seen in a residential apartment, the Court finds Officer Grogan's concerns about the drugs being flushed down a toilet or thrown out a window to be reasonable. In sum, because of the small quantity of drugs located in a place in which they could be easily destroyed, the Court finds

March 6, 1988, attached to the Government's letter to the Court, dated March 4, 1998.

**3.** In the present case, the Court applies the federal constitutional standard of "reasonable suspicion" rather than the state standard of "probable cause." *See United States v. Workman,* 80 F.3d

688, 694 (2d Cir.) (where evidence seized by state officials is subsequently offered in a federal criminal proceeding, the seizure need not satisfy the state requirement; the touchstone of the court's review is "the Fourth Amendment and its requirements and no more"), *cert. denied,* — U.S. ——, 117 S.Ct. 319, 136 L.Ed.2d 233 (1996).

that Officer Grogan's suspicions about the destruction of evidence were reasonable and justified the issuance of a no-knock warrant.[4]

In *United States v. Moore*, 956 F.2d 843 (8th Cir.1992), the Court of Appeals for the Eighth Circuit was faced with the same legal issue presented here: whether a police officer's affidavit established reasonable cause to believe that drugs would be destroyed if the officer announced himself before entering.[5] Unlike the present case, the police officer's affidavit in *Moore* did not contain information regarding the quantity of drugs involved. In acknowledging the weakness of the Government's contention that the affidavit was nonetheless sufficient for the authorization of a no-knock warrant, the Court stated, "Had [the officer] included information regarding the quantity of drugs in [the defendant]'s house, or other information creating a reasonable fear of destruction ... we would be far more confident that this affidavit justified the issuance of a constitutionally reasonable no-knock warrant." *Id.* at 851. Therefore, the Court finds that the facts and circumstances in the present case support a reasonable suspicion that the cocaine could be quickly and easily destroyed if the officers executing the search knocked and announced themselves before entering the premises. Accordingly, Tavarez's Fourth Amendment rights were not violated and his motion to suppress the evidence seized from his apartment on March 9, 1995 is denied.[6]

### B. Good Faith Exception

Even if the Court did not find reasonable suspicion to believe that evidence could easily be destroyed, the motion to suppress would nonetheless be denied in light of the good faith exception to the exclusionary rule. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court carved out an exception to the general rule that evidence obtained in violation of the Fourth Amendment must be excluded from trial: The Court held that evidence obtained pursuant to a search warrant that was later found to be invalid need not be suppressed if the officer reasonably relied in good faith on the validity of the warrant. *Id.* at 918–21. The test of objective good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 923. There are four situations in which the good faith exception is inapplicable, that is, where an executing officer's reliance on a warrant could not be in good faith: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *United States v. Moore*, 968 F.2d at 222.

In the present case, it is clear the officers who executed the Search Warrant relied upon it in good faith. Officer Grogan testified that he had no reason to doubt the validity of the no-knock warrant. Tr. at 16. In addition, Officer Grogan stated that at the time he applied for the Search Warrant, he understood that the destruction of evidence and the safety of police officers were valid legal bases for obtaining a no-knock warrant.

4. At the suppression hearing, the Government attempted to establish Officer Grogan's concern for safety as an independent justification for the no-knock warrant. Because this concern was not included in Officer Grogan's affidavit and because Officer Grogan conceded that he had no specific safety concerns about this particular search, the Court finds this argument to be without merit.

5. In *Moore*, the Eighth Circuit held that there is no per se exception to the knock and announce requirement of the Fourth Amendment, the same holding announced by the Supreme Court in *Richards v. Wisconsin* five years later.

6. Having reached this conclusion, the Court nonetheless recognizes the impropriety of Officer

Grogan's warrant-seeking strategy in light of *Richards v. Wisconsin*. At the suppression hearing, Grogan testified that it was his practice to apply for a no-knock warrant in every narcotics case, even absent specific information about the place or individuals to be searched, on account of his view that all narcotics cases pose a risk of destruction of evidence and safety hazards. Tr. at 35–36. Although the Court has determined that Grogan's suspicions were reasonable under the specific facts and circumstances of this case, his suspicions about the destruction of evidence in all narcotics cases simply because they are narcotics cases, runs afoul of the Supreme Court's holding in *Richards v. Wisconsin*.

Tr. at 16. Moreover, there is no indication in the record, nor even an assertion by Tavarez, that this case involves any of the situations in which the good faith exception is inapplicable. As such, this case fits squarely within the principle of *United States v. Leon.* See *United States v. Cooper,* No. 90 Cr. 415, 1991 WL 60371, at *5 (S.D.N.Y. April 9, 1991) (officers who did not give notice before executing search acted in good faith reliance on no-knock warrant and thus evidence not excluded). Accordingly, even if the no-knock Search Warrant was invalid, the physical evidence seized from Tavarez's apartment would nonetheless be admissible pursuant to the good faith exception to the exclusionary rule.

### C. Violent Nature of Search

■ The text of the Fourth Amendment makes clear that all searches must be "reasonable." The reasonableness requirement of the Fourth Amendment applies not only to the circumstances under which a warrant may be issued, but also to the manner and scope of a search. *Ayeni v. Mottola,* 35 F.3d 680, 684 (2d Cir.1994), *cert. denied,* 514 U.S. 1062, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995). Thus, a search that is unduly destructive or invasive in nature may violate an individual's Fourth Amendment rights.

■ Although Tavarez argues that the violent nature of the search warrants suppression of the evidence seized from his apartment, he falls far short of establishing a Fourth Amendment violation justifying the suppression of evidence. Tavarez has not provided any specific factual assertions regarding the nature and/or consequences of the search. Rather, he conclusively asserts that the police "ransacked the apartment." Tavarez Aff. ¶ 2. As such, this claim is factually deficient.[7]

■ In any event, even when a Fourth Amendment violation has occurred, evidence will not be excluded unless a causal relationship exists between the particular violation at issue and the discovery of the evidence sought to be excluded. *United States v. Clark,* 891 F.2d 501, 505 (4th Cir.1989); *see*

also *United States v. Ramirez,* —— U.S. ——, 118 S.Ct. 992, 997 n.3, —— L.Ed.2d —— (1998) (recognizing that after finding a Fourth Amendment violation based on the violent nature of a search, the court must then decide whether "there was sufficient causal relationship between the [violent acts] and the discovery of the [evidence] to warrant suppression of the evidence.") In other words, only where the evidence is "in some sense the product of illegal government activity" is suppression warranted. *New York v. Harris,* 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).

Tavarez does not contend that there is any causal relationship between the violent nature of the search and the discovery of the evidence he seeks to have suppressed. In other words, Tavarez does not argue that but for the destructive nature of the search, the police officers would not have found the evidence at issue. Given the absence of such an assertion, Tavarez's claim must fail.

### II. Post-Arrest Statements

■ The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Once an accused has expressed a wish for counsel he is not subject to further interrogation until counsel has been made available to him, unless he himself initiates further communication with the police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Therefore, the issue of whether Tavarez's Sixth Amendment right to counsel was violated, and thus whether his post-arrest statements must be suppressed, depends entirely on the factual question of whether Tavarez requested an attorney after he was arrested.

The Government claims that at no time did Tavarez request the assistance of counsel. Tavarez, on the other hand, alleges that he invoked his right to counsel at least five times between his arrest and the execution of the waiver of right forms, but was nonethe-

---

**7.** Moreover, the only bases for this allegation are the affidavits of Tavarez and Nunez. As discussed below, these affidavits are devoid of credi-

bility, given both witnesses' concessions that they did not read the affidavits before they were signed.

less interrogated by police officers without an attorney and without having initiated communication. Based on the testimony elicited at the suppression hearing, the Court finds that Tavarez's Sixth Amendment right to counsel was not violated and thus his post-arrest statements need not be suppressed.

Both agents testified that Tavarez was advised of his constitutional rights at least twice, once in the car, and then again at FBI headquarters. Likewise, both agents testified that Tavarez did not request an attorney at any time, and signed the consent to search form and the waiver of rights forms without incident. The Court finds the testimony provided by Agents Higgins and Flores to be very credible. In fact, Flores's testimony is bolstered by Assistant United States Attorney Dan Himmelfarb's handwritten notes taken in preparation for the instant motion. The heading on the single page of notes is "Voice-mail messages from Jose Flores." Under "Message # 2," it states, "Did not ask for atty in apt or in car; Higgins in back seat; Flores did driving." Gov't Exh. "3503."

Tavarez's testimony to the contrary is simply unbelievable. As an initial matter, Tavarez's credibility was seriously called into question on cross-examination by the Government. For example, Tavarez initially denied having signed the waiver of right forms, but after being confronted with his signature on the documents admitted to having executed them. Tr. at 180–81. Similarly, Tavarez claimed to have been at FBI headquarters for "about five hours" before signing the waiver of rights forms. Tr. at 191–92. In fact, however, it is undisputed that Tavarez arrived at headquarters between 9:00 a.m. and 10:00 a.m. and that the waiver of rights forms were executed at 9:40 a.m.[8] Tr. at 191–92. Moreover, Tavarez's account of the events on December 17, 1995 at the suppression hearing differ significantly from the facts alleged in his sworn affidavit. For example, although Tavarez claimed at the suppression hearing that Higgins threatened to arrest Nunez in order to coerce him into signing the consent to search form, no such facts are included in his affidavit. Perhaps more indicative of Tavarez's propensity for untruthfulness is the fact that Tavarez admitted that he did not read his affidavit before signing it, but rather "just signed something that [he] was told that [he] was given to sign when [his attorney] told [him] that [he] had to sign." Tr. at 183. Finally, certain testimony provided by Tavarez was simply incredible on its face. For example, Tavarez stated that during the car ride to FBI headquarters, he was alone in the car with Higgins and Higgins drove, while Tavarez was seated in the rear passenger seat. Tr. at 170. Tavarez concedes that the car did not have any protective barrier between the front and rear seats. Tr. at 184. Given the obvious and significant safety risks posed by such Tavarez's scenario, as well as Higgins's testimony regarding his practice of transporting a prisoner, the Court finds Tavarez's testimony on this subject to be less than forthright.

Similarly, the Court gives little weight to Nunez's and Mrs. Tavarez's testimony. Both witnesses testified that Tavarez asked Mrs. Tavarez to get him an attorney in the presence of law enforcement officers. The Court finds Nunez's credibility to be questionable, at best, for two reasons. First, Nunez testified that she had no recollection of reading or understanding her affidavit before signing it. Tr. at 227–29. Second, Nunez admitted to lying under oath in a state criminal proceeding and stated that she "would do it again." Tr. at 232–33. Although Mrs. Tavarez was not directly impeached at the suppression hearing, the Court is skeptical about her testimony as well. Mrs. Tavarez has a personal interest in the outcome of this motion and her statements directly contradict the credible testimony provided by Higgins and Flores.[9] Accordingly, Tavarez's Sixth

---

8. Not only is the time of execution listed on the consent forms, but in his own affidavit, Tavarez states that he waived his right to an attorney at approximately 9:45 a.m. Tavarez Aff. ¶ 4.

9. To the extent that Tavarez relies on the fact that a privately retained attorney appeared at his presentment as evidence that he told his mother to get him an attorney, this argument is unpersuasive. First, there is no evidence that Tavarez was not granted access to a phone at pretrial services prior to presentment. Second, it is possible that Mrs. Tavarez's knew to call an attorney even without being told.

Amendment right to counsel was not violated and his motion to suppress his post-arrest statements is denied.

## CONCLUSION

For the reasons set forth above, Tavarez's motion to suppress the physical evidence seized from his apartment on March 9, 1995 and his post-arrest statements is denied.

SO ORDERED.