**Peter F. MARTIN**

v.

**Edgar RODRIGUEZ, et al.**

**No. 3:99CV487(JBA).**

United States District Court,
D. Connecticut.

July 19, 2001.

John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiff.

Robert Bishop Fiske, III, Atty. Gens. Office, Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION
### [Doc. # 26]

ARTERTON, District Judge.

Plaintiff Peter F. Martin was arrested as a felon in possession of a firearm, in violation of Conn. Gen.Stat. § 53a–217. Plaintiff is not a convicted felon, however. Because the criminal records of one Peter B. Martin were mistakenly merged with those of plaintiff (Peter F. Martin), the background check conducted following his purchase of a hunting rifle showed that he had previously been convicted of burglary in the third degree and larceny in the second degree. The police obtained and executed search and arrest warrants based on this mistaken information.

Plaintiff brought suit under 28 U.S.C. § 1983 against Connecticut state troopers Edgar Rodriguez, Roland Levesque, Timothy Osika and Mark Piccurillo,[1] claiming that defendants violated his civil rights by conducting an unreasonable search and seizure of him and his property, arresting him under an invalid warrant for a crime he did not commit, and holding him under an unreasonable and excessive bond, in violation of the Fourth, Eighth and Fourteenth Amendments of the Constitution.

---

1. Plaintiff's complaint also names trooper Rodgers as a defendant, who was dismissed on July 9, 1999.

Plaintiff also asserts a state law claim of intentional infliction of emotional distress.

Defendants have moved for summary judgment on all claims [Doc. # 26]. For the reasons discussed below, the Court finds that there are no material facts in dispute and that defendants are entitled to judgment as a matter of law on plaintiff's constitutional claims. The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims. Accordingly, defendants' motion is GRANTED.

**Factual Background**

On October 6, 1998, plaintiff purchased a .22 caliber rifle from Townline Boating and Sporting Accessories in Watertown, Connecticut. Although Connecticut usually requires a two-week waiting period for gun purchases, to allow time to conduct a background check, plaintiff was able to bypass the waiting period and the immediate background check because he had a Connecticut hunting license.[2]

The store owner then submitted the required documentation to federal and state authorities. The Connecticut state police, Special License and Firearm Unit conducted the required criminal history check, during which it was discovered that a "Peter F. Martin" had two prior felony convictions for burglary in 1975 and larceny in 1978. Accordingly, the application for sale was returned to the store dealer stamped "Sale denied." The dealer then contacted the state police on October 27, 1998 to report that the sale had been denied.

On November 10, 1998, the police confirmed the SPBI criminal history check, which showed that a Peter Martin, with a date of birth of March 19, 1957, weight of 135 pounds and height of 5′5″, had two convictions for burglary and larceny. The police also determined that plaintiff Peter F. Martin had a March 19, 1957 date of birth and a valid Connecticut drivers license and registration for a 1988 Jeep station wagon, and confirmed that his home address was 450 Nonnewaug Road, Bethlehem, Connecticut. Detectives Rodriguez and Levesque then sought an arrest warrant and search warrants for plaintiff's car and house based on this information, which were issued on December 1, 1998.

On December 2, 1998, at 7:00 a.m., Connecticut state troopers Rodriguez, Levesque, Osika and Piccurillo arrived at plaintiff's house. Two of plaintiff's children, aged 11 and 13, were waiting for the school bus approximately fifty feet from the front door, and the police asked the children whether plaintiff was home, and then went to the front door. The police displayed an arrest warrant and search warrants for plaintiff's car and house when they knocked on the door. While plaintiff's children were waiting for the bus, the troopers knocked on the door, and brought empty boxes into the house. The school bus came approximately ten minutes after they arrived, and left before the officers came out of the house carrying plaintiff's firearms. Plaintiff's children watched the officers enter the house and saw plaintiff handcuffed and seated. Other children on the school bus also observed the officers outside plaintiff's house.

Plaintiff was told that he was under arrest as a felon in possession of a firearm, and was shown the search warrants. He was handcuffed and seated on a chair inside the house. Plaintiff was asked his name and date of birth, and the officers compared it to the information on the copy of his drivers license they had printed out prior to the arrest, which matched the date of birth on the criminal history information. Plaintiff's physical description in the criminal history information also matched

**2.** *See* Conn. Gen.Stat. § 29–37(a).

310

his physical appearance when he was arrested. After the officers asked plaintiff about the two felony convictions, he told the officers "at least twice" that there was a mix-up, that this had occurred when he was in court on a previous DWI charge, that there was another Peter Martin to whom the felony convictions belonged who was six feet tall, and that they could call his attorney who would explain the mix-up. The police then rechecked plaintiff's name and date of birth on the SPBI criminal history information.

During the search of plaintiff's home and car, the police discovered seventeen guns and eighteen boxes of ammunition. The guns were photographed and then removed. Many of the guns were in padded cases; those guns were removed from plaintiff's house in their cases. Six guns, however, were not in cases, and the police carried those from the house without any protection. Martin told the officers who were carrying the guns that he did not treat his firearms in such a careless fashion. The search of Martin's home lasted approximately two hours. In his deposition, Martin stated that the police left his office "messy," but did not mention any damage to his house.

After the search was completed, defendants locked the door to plaintiff's house, and defendant Osika drove plaintiff to the police station, while plaintiff continued to protest his innocence. Plaintiff was questioned, finger-printed and photographed when he arrived at the station. Defendants told plaintiff they would check to see whether his prints matched the prints on the criminal arrest records. Osika then submitted the fingerprints they had just taken to SPBI, which faxed confirmation that plaintiff's prints matched the fingerprints on file for plaintiff, and gave an identical criminal history printout. Osika also researched plaintiff's DWI arrest; the

file for that arrest contained an identical arrest record, including the two felony convictions. Osika then contacted SPBI again, and found that there were no fingerprints on file with the felony convictions, and that the arrest data for those crimes had been submitted by two separate departments, and were both more than twenty years old. He was thus unable to further confirm or deny plaintiff's claims of innocence while plaintiff was in custody.

While plaintiff was being questioned, defendant Rodriguez told him that he hoped he owned his house because he was going to need it for a bond, and told plaintiff he was lying about the mix-up. Plaintiff was "extremely upset" by what Rodriguez told him. Plaintiff was then placed in a cell until he was released on a promise to appear, approximately two hours after he arrived at the station. When he was released, plaintiff claims he was told by defendant Osika that the police did not run a taxi service and that he would have to get his own ride home; however, it is undisputed that he was driven home by defendant Piccurillo. When plaintiff arrived home, he did not have a key to his house, and broke the door to get in.

After plaintiff was released, Osika continued his investigation into plaintiff's allegations of misidentification. He contacted the Wolcott Police Department regarding the burglary conviction, and was informed that all records, including fingerprints, had been purged due to the age of the offense. He then contacted a lieutenant in the Investigations Unit, who found an index card recording a burglary arrest on January 5, 1975, of a Peter B. Martin of New Fairfield, Connecticut, whose date of birth was July 17, 1957. Osika concluded that this arrest had been incorrectly attributed to plaintiff. He also learned that Peter B. Martin had served time in state prison for this offense, and had numerous tattoos and

a partially amputated finger, but had no record in the State Criminal Record Check ("SCRC") database.

Osika then attempted to determine whether the larceny arrest was properly attributed to plaintiff. He contacted the Bridgeport Superior Court, which had no information. The state probation department then researched records indicating that Peter B. Martin had served a period of supervised release for a larceny conviction in 1978, although no SCRC information existed for any "Peter B. Martin." Osika did find a record for Peter B. Martin under a different SPBI number and fingerprint classification. Osika then discussed his findings with the SPBI Fingerprint Unit and Records Unit, which concluded that the arrest data was attributed to plaintiff's record in error. The incorrect felony data was removed from plaintiff's file on December 8, 1998.

Three days later, the charges against plaintiff were dismissed, and Osika obtained authorization to return the seized property. Plaintiff's guns were returned to him on December 14, 1998. Those guns that had been in cases were returned in the original condition; however, the six guns that were taken without cases had nicks and scratches on them when they were returned. Plaintiff had those guns appraised by C.W. Mellette, Custom Gunsmith. According to the appraisal, it will cost $2,472 to repair or restore the guns.

**Standard**

A court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). The moving party bears the initial burden of establishing

that no genuine issue of material fact exists and that the undisputed facts show that she is entitled to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

The non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome a motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Discussion**

Defendants begin by arguing that they are entitled to summary judgment on qualified immunity grounds, claiming that objectively reasonable officers would have believed they had probable cause to arrest plaintiff and search his premises under these circumstances. However, the Supreme Court has instructed that district courts facing allegations of constitutional violations should first determine whether

or not a violation occurred, and only if a violation is found go on to assess whether the defendants are entitled to qualified immunity for their acts. *See Wilson v. Layne*, 526 U.S. 603, 607–11, 119 S.Ct. 1692, 1696–97, 143 L.Ed.2d 818 (1999); *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Lauro v. Charles*, 219 F.3d 202, 206 (2d Cir.2000); *X–Men Sec. Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir.1999). Although Second Circuit caselaw suggests that *Wilson* should not be read as a mandate to "the lower courts to abandon a widespread practice and a generally recognized precept of avoiding unnecessary constitutional adjudication," the Second Circuit has also noted that "where defendants are entitled to qualified immunity, it is more consistent with traditional principles of restraint to reach the merits when the constitutional right in question does not exist than when it does; in the former circumstance, the finding of no right is the holding, and the court is not declaring new constitutional rights in dictum that cannot be appealed." *Horne v. Coughlin*, 191 F.3d 244, 248, 249 (2d Cir.), *cert. denied*, 528 U.S. 1052, 120 S.Ct. 594, 145 L.Ed.2d 493 (1999); *see also Mollica v. Volker*, 229 F.3d 366, (2d Cir.2000).

Because the Court concludes that the undisputed facts show that defendants did not violate plaintiff's constitutional rights when they arrested him and searched his property, no new constitutional right is declared, and the Court does not reach the issue of qualified immunity.[3]

## A. *Arrest without probable cause*

 "There can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995). Probable cause to arrest exists when "the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991). The amount of evidence required to establish probable cause to arrest is less than that necessary to support a conviction and, thus, the fact that the charges against plaintiff were dismissed does not necessarily mean that probable cause was lacking for his arrest. *See Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir.1989). In determining whether probable cause to arrest existed, the Court must evaluate the totality of the circumstances based on those facts available to the officers at the time of the arrest. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996). "[T]he existence of probable cause, vel non, is assessed based on probabilities, not certitude, as viewed by a reasonably prudent law enforcement official considering all the objective facts known prior to effectuating the arrest." *Carson v. Lewis*, 35 F.Supp.2d 250, 258 (E.D.N.Y.1999).

---

**3.** Although plaintiff's complaint also alleges that defendants violated the Eighth Amendment by imposing an excessive bail, the undisputed facts of this case show that defendant was not kept in custody, but was instead released on a written promise to appear approximately two hours after he was taken to the police station for processing. Indeed, during his deposition, plaintiff conceded that he was *not* "held prisoner under an unreasonable and excessive bail bond" because he was released. *Compare* Compl. ¶ 1, *with* Dep. at 78–79. Therefore, while defendants' motion does not address the Eighth Amendment claim, this oversight is not a bar to summary judgment in this case, as the Court considers that plaintiff has abandoned this claim.

Plaintiff does not claim that the information submitted by the detectives was insufficient to provide probable cause for the arrest and search warrants or that the officers knew the information regarding the two felony convictions was false. Instead, plaintiff's argument goes, the officers should have been suspicious because he had a hunting license and because they were aware of his good reputation in the community. According to plaintiff, the Fourth Amendment required the officers to investigate the "obvious discrepancy" between his Connecticut hunting license and the criminal history printout showing that plaintiff had two felony convictions before they sought the warrants.

Defendants, in turn, argue that an arrest pursuant to a valid warrant supported by probable cause does not violate the Fourth Amendment even though it later turns out that the information was erroneous. Defendants claim that because the SPBI records are a reliable source, and they were unaware that the information was incorrect when they sought the warrant, the arrest did not violate the Fourth Amendment. Defendants further assert that they were under no duty to investigate plaintiff's claims of innocence when arrested, and that they did all they could at time to confirm that they arrested the right person.

The critical issue here is whether detectives' Rodriguez and Levesque's awareness of the fact that plaintiff had a hunting license made their actions in seeking a warrant unreasonable. Hunting licenses are issued pursuant to Conn. Gen.Stat. §§ 26–30 and 26–31, following completion of a course of instruction in safety practices, and can be renewed by presenting a

certificate showing that the applicant has held a resident license to hunt with firearms in any state or county within the past five years. See Conn. Gen.Stat. § 26–31(a), (b). However, these statutes do not provide that licenses to hunt with firearms may not be issued to convicted felons.

■ After the required background check in the gun purchase was conducted here, the state police records showed that plaintiff had two felony convictions. The officers sought to confirm plaintiff's name, address, date of birth, and determined that plaintiff's date of birth matched that on the criminal history records. There is no allegation here that the SPBI criminal history records generally are not a reliable source, and contrary to plaintiff's argument, there was no reason for the detectives to believe that their information was inaccurate. Instead, there had been a clerical error that took detective Osika several days to uncover once he was alerted to the possibility of misidentification. Under these circumstances, the Court concludes that defendants had probable cause to arrest plaintiff and therefore did not violate plaintiff's Fourth Amendment rights. See Baker v. McCollan, 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (no recovery under § 1983 where plaintiff was arrested with probable cause and pursuant to valid arrest warrant that later turned out to be mistaken); Ruiz v. Herrera, 745 F.Supp. 940, 946 (S.D.N.Y.1990) ("[I]f a police officer deliberately arrests someone without probable cause, he is liable under 42 U.S.C. § 1983. If, on the other hand, a police officer arrests someone with probable cause, but by mistake, there is no constitutional violation.").[4]

---

4. Plaintiff's contention that the probable cause determination should have taken into account the fact that defendant Piccurillo knew who plaintiff was because plaintiff had

done contracting work in the building where Piccurillo worked is legally unsupported, and provides no legally relevant inference of lack of probable cause. The mere fact that Piccu-

■ Finally, to the extent that plaintiff's brief can be read as arguing that his protestations of innocence and request that the arresting officers contact his attorney required the arresting officers to investigate those assertions before arresting him, that argument is similarly unsupported by caselaw. *See McCollan,* 443 U.S. at 145–46, 99 S.Ct. 2689 ("we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent"); *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

## B. *Unreasonable search and seizure*

Defendants next claim that they are entitled to summary judgment because the search and seizure did not violate the Fourth Amendment. Plaintiff does not argue that the police lacked probable cause to search his premises. Instead, he asserts that the manner in which the search was carried out was unreasonable.

■ "The text of the Fourth Amendment makes clear that all searches must be 'reasonable.'" *United States v. Tavarez,* 995 F.Supp. 443, 449 (S.D.N.Y.1998). This reasonableness requirement applies not only to the circumstances under which a warrant may be issued, but also to the manner and scope of a search. *See Ayeni v. Mottola,* 35 F.3d 680, 684 (2d Cir.1994); *Rivera v. United States,* 928 F.2d 592, 606–07 (2d Cir.1991). "The general touch-stone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant. Excessive or unnecessary destruction of property in the course of a search warrant may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). Thus, a search that is unduly destructive or invasive in nature may violate an individual's Fourth Amendment rights.

It is unclear from plaintiff's brief precisely which elements of the search he believes are unreasonable. However, he appears to argue that because the arrest and search were conducted while his children waited for the school bus, he was held for two hours in handcuffs, and "in the course of the search, they trashed the house itself, throwing and scattering property needlessly and destructively," Pl. Mem. in Opp. at 3, the manner in which the search and arrest warrants were carried out violated the Fourth Amendment. For the reasons that follow, the Court concludes that plaintiff's version of the facts falls far short of establishing a constitutional violation.

■ As to the timing of the search, while plaintiff argues that the police should have come at different time so that the children would not witness their father being arrested, plaintiff also admitted in his deposition that he left his house around 7:00 in the morning to go to work. Plaintiff cites no caselaw for the proposition that police cannot execute a warrant in the presence of children. There is no allegation that the police harmed or threatened

---

rillo knew plaintiff by sight does not make it any less likely that plaintiff had been convicted of felonies in 1975 and 1978.

the children in any way. Under these circumstances, there was nothing unreasonable in the decision to execute the warrant at a time when the police reasonably believed plaintiff would be at home.

 Further, plaintiff's contention that he was handcuffed for two hours while the search was conducted does not establish a Fourth Amendment constitutional violation. A "warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Therefore, "[a]bsent special circumstances, the police . . . have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion." *Rivera,* 928 F.2d at 606. Here, plaintiff was under arrest while the officers searched his house, and he has offered no evidence of any special circumstances that might make the detention during the search unlawful. *See Crosby v. Hare,* 932 F.Supp. 490, 493 (W.D.N.Y. 1996). "For their own safety, it was more than reasonable for the police to detain [plaintiff] . . . for a[ ] period of time in handcuffs" while the search of the premises was conducted. *Id.* (*citing United States v. Fountain,* 2 F.3d 656, 666 (6th Cir.1993); *Howard v. Schoberle,* 907 F.Supp. 671, 677 (S.D.N.Y.1995)). Plaintiff's facts simply do not demonstrate any constitutional violation.

 Further, despite the characterization of plaintiff's house as "trashed" in plaintiff's brief, in his deposition he clearly stated that the only premises damage was that the officers left his office "messy." The photographs submitted in support of plaintiff's opposition to summary judgment similarly do not show any destruction of property (apart from plaintiff's door, which

he himself broke down upon returning home). The officers were searching for firearms, and plaintiff has provided no evidence that the search was unnecessarily thorough to fulfil its purpose. Under these circumstances, the Court finds that plaintiff's claim of the nature of the search of the premises cannot constitute a Fourth Amendment violation. *See Lewis v. City of Mount Vernon,* 984 F.Supp. 748, 756 (S.D.N.Y.1997) (allegation that officers left plaintiffs' apartment "ransacked" did not state constitutional violation where plaintiffs "presented no evidence that the officers wantonly damaged or destroyed property or conducted the search in a manner inconsistent with its professed purpose of finding illicit drugs"; instead, "the only inference that can be drawn is that the officers conducted a thorough search, as they were permitted to do in executing a warrant").

Plaintiff also argues that defendants negligently damaged several of his firearms at some point after the guns were seized and before they were returned to him, and that it will cost approximately $2,500 to repair the damaged guns. Defendants respond that negligent damage to property after it has already been seized does not violate the Fourth Amendment, and that plaintiff's remedy for the damage is to be found in his action against the State currently pending before the Claims Commissioner. In light of the existence of this post-deprivation procedure, plaintiff wisely does not press his Fourteenth Amendment due process claim that defendants negligently damaged his property. *See Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (negligent destruction of property does not violate Fourteenth Amendment assuming an adequate post-deprivation remedy exists); *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (inten-

tional destruction of property does not violate the Fourteenth Amendment if there is a meaningful post-deprivation remedy). Instead, plaintiff argues that the damage was part of the unreasonable seizure of his property.

The Court has previously found that the police acted reasonably within the scope of the Fourth Amendment when they searched the house, and the seizure of the seventeen firearms itself was reasonable, as the guns were clearly evidence supporting the conclusion that plaintiff had committed a crime. *See New Jersey v. T.L.O.,* 469 U.S. 325, 345–46, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (where police could reasonably believe that an item seized may be relevant evidence in a particular criminal prosecution, holding the item does not violate the Fourth Amendment); *Warden v. Hayden,* 387 U.S. 294, 306–08, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (same). Plaintiff does not claim that defendants unnecessarily delayed return of his property following the determination that the arrest and seizure were based on erroneous information.

Neither plaintiff nor defendants have analyzed whether conduct by the police after property has already been taken into possession is properly analyzed under the Fourth Amendment. The Sixth Circuit has provided a useful analysis in *Fox v. Van Oosterum,* 176 F.3d 342, 350–51 (6th Cir.1999), which held that police refusal to return seized property for four months that occurred following a reasonable seizure of property does not bring "about an additional seizure nor change[ ] the character of the [original] seizure from a reasonable one to an unreasonable one because the seizure was already complete . . . ." The court reasoned that while the Fourth Amendment protects a person's property interest in his possessions, that interest is in the *retention* of possession,

rather than in gaining return of the property once it has been lawfully seized: "Once that act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." *Id.* at 351. The court also observed that such claims are more commonly encompassed within the procedural due process analysis of the Fourteenth Amendment. *Id.* at 352; *see also Wagner v. Higgins,* 754 F.2d 186, 194 (6th Cir.1985) (Contie, J., concurring) ("[t]he appropriate source of constitutional protection against" alleged interference with a person's possessions, contrasted with temporary seizures, "lies not in the fourth amendment but in the due process clause of the fourteenth amendment"). This Court finds this reasoning persuasive. That the police allegedly scratched the guns while they were in police custody may, as previously noted, give rise to a negligence claim. It does not, however, implicate the Fourth Amendment's prohibition on unreasonable seizures.

Finally, the alleged "verbal taunting and abuse" by Rodriguez while plaintiff was at the station does not rise to the level of a violation of plaintiff's constitutional rights as matter of law. Although verbal taunting by police might conceivably be so abusive and offensive as to violate the Constitution under some circumstances, the conduct actually described by plaintiff is not. According to plaintiff, Rodriguez told him he hoped plaintiff owned his house because he would need it to post bond and that he was lying about the mistaken identity. In the Court's view, this conduct falls far short of proving a Fourth Amendment constitutional violation.

### C. Pendent state law claim

Having determined that defendants are entitled to summary judgment on plaintiff's federal claims, the Court declines to

exercise supplemental jurisdiction over plaintiff's state law claim of intentional infliction of emotional distress.[5] *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."); *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995) (same).

## Conclusion

Although plaintiff's distress at being the subject of an erroneous arrest is certainly understandable, the facts set forth by plaintiff or otherwise undisputed show that the state police defendants had probable cause to seek the arrest and search warrants, and executed those warrants reasonably. Accordingly, for the reasons discussed above, defendants' motion for summary judgment [Doc. # 26] is GRANTED.

The Clerk is directed to close this case.

IT IS SO ORDERED.

---

**5.** Defendants inexplicably devote two pages in their brief to arguing that they are entitled to summary judgment on plaintiff's state law false arrest claim. Plaintiff's complaint contains no such claim.